1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PAULETTE REGINA VILLA,

11              Petitioner,            No. CIV S-02-1301 DFL JFM P

12        vs.

13   GWENDOLYN MITCHELL, et al.,       ORDER AND

14              Respondents.           FINDINGS & RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges her 1998 conviction on

18   charges of second degree murder (Cal. Pen. Code §§ 187, 189).  (Answer, Ex. A.)  She was

19   sentenced to an indeterminate term of fifteen years to life on March 3, 1998.  (Id.)  She seeks

20   relief on the grounds of juror misconduct;[1] insufficiency of the evidence to support her

21   conviction under an aiding and abetting theory; and trial court errors in failing to give a

22

23         [1]  Petitioner's co-defendant, Louis Baca, also has an application for writ of habeas corpus
     pending in this court.  See CIV S-03-1685 DFL JFM P.  A court may take judicial notice of court
     records.  See MGIC Indem. Co. v. Weisman, 803 F.2d 500, 505 (9th Cir. 1986); United States v.
24   Wilson, 631 F.2d 118, 119 (9th Cir. 1980).  Baca's attorney hired an investigator to interview
     Juror No. 2 concerning the claim of juror misconduct and a transcript of that interview was
25   appended to counsel's January 14, 2004 Declaration (Docket No. 15 in CIV S-03-1685 DFL JFM
     P).  The court has considered this transcript in its ruling on petitioner's case and will direct the
26   Clerk of the Court to file a copy of the transcript in this case to facilitate appellate review, if any.

unanimity jury instruction with regard to the charge against petitioner and in failing to give an

instruction on the lesser included offense of voluntary manslaughter.  Upon careful consideration

of the record and the applicable law, the undersigned will recommend that petitioner's

application for habeas corpus relief be denied.

FACTUAL BACKGROUND[2]

> In the early part of 1997, Villa had met her third cousin, Baca, a few times.  He lived in the Bay Area and had a tattoo on his forearm displaying a Bay Area gang name, "Decoto Gangsters X4."  After one such visit, she discovered his loaded handgun under her baby's car seat in the back seat of her parents' car.  Although she insisted she was not a member of a gang, she associated with others who were, including her ex-husband, and her brother had been stabbed by a member of the Tracy Southside gang.

> On March 13, Baca drove to Tracy to retrieve his gun from his cousin.  Another cousin Villa had never met had accompanied Baca from the Bay Area.  Villa was angry Baca had endangered her children, but said nothing.  Baca was angry the gun was scratched and he clearly expressed his displeasure.  He was also upset because the gun seemed to be jammed.  He asked her to take him to the store to buy beer.  She obtained permission from her mother, with whom she and her three daughters were living.

> On the way to the store, Villa saw two young women, who were later identified as Marie Sturdivant and Celina Martinez, walking on the sidewalk with Celina's brother, David, whom they called "Pelon."  Villa thought they said something as she drove by so she made a U-turn to inquire.  Villa pulled up alongside Celina, Marie and Pelon, at which time Baca jumped out of the car.  He asked Pelon whom he was "dogging."  One of the young women asked who he was.  Baca pulled out a gun and pointed it at their heads.  Pelon said he did not want any trouble.  Baca yelled something like "Decoto" or "Decoto Norte X4" and returned to the car.  Jesse Diaz, who was walking ahead of Celina, Marie and Pelon, heard a male say something like "Norteno" and "look at you guys now."

---

[2]  This statement of facts is taken from the July 5, 2000 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 3-6, appended as Exhibit C to Respondent's Answer, filed on February 7, 2003.

Petitioner was tried with her co-defendant, Louis Baca.  Angel Buckman was identified as another person in the back seat of the car during the incidents at issue herein.  Mr. Buckman was prosecuted separately and pled guilty.  Buckman was called to the stand in the Baca/Villa trial but refused to answer any questions.  (RT 698-709.)

Celina and Marie both saw Villa smiling or laughing during the confrontation. They denied being members of a gang.

Villa, Celina and Marie testified no one was yelling or arguing. Diane Gaarde, although accustomed to noise and violence in her neighborhood, was awakened by loud and angry male and female voices through her closed windows. She lay in her bed listening but could not understand any of the words spoken. She described the area as a no-man's land for gangs and confrontations.

Meanwhile, Marie, Celina and Pelon walked on to the market. Although Pelon mentioned he did not like guns, the trio was rather nonchalant about the assault. They mentioned it to the store clerk but they did not call the police. As they walked back, they saw the same car again. Diaz heard a female voice shout "Southside." Celina and Marie both denied shouting "Southside." Villa testified she did not hear anyone shout "Southside."

As Villa passed the group a second time, Baca told her to turn around. She complied. Baca leaned out the window of the car and fired a shot at the three, who by then were running across a field. Pelon grabbed his side. He yelled at his sister and Marie to get down. They all dropped into the tall grass. Villa circled around and Baca fired two more shots. The ever-vigilant Mrs. Gaarde heard a female voice from the driver's seat, a male voice from the passenger seat and another male voice from the rear seat. She heard one of the males say, "I got him I got him" in a voice as jubilant as if he had just won the World Series. Pelon died as a result of a gunshot wound to the chest.

Villa drove home, by her account, stunned and scared. She passed the police station. When they arrived home, she went into the house to get Baca money for gas. She curled up on the floor beside the couch and fell asleep.

The following morning Baca called. While being surveilled, she took out the car seat from the rear seat, brushed out the rear seat, and hosed down the car, including the door and window on the passenger side. She testified this was her customary routine before leaving for school. She was arrested before she completed cleaning her car.

The investigating officers found two expended .9 millimeter shells on the street near the shooting and a bullet in the field into which Marie, Celina and Pelon ran. During a search of Baca's residence, officers confiscated a candy box containing four .9 millimeter casings and an empty box for a Taurus .9 millimeter handgun. The expended bullets and the casings had been fired from the same weapon, which could have been a Taurus handgun.

/////

3

1
2
3
4

       Villa testified in her own defense.  She insisted she did not intend for anyone to die.  She stated she did not know the gun was operable or that Baca would actually shoot it.  A divorced mother of three young girls, she had gone back to school and had turned her life around.  She was within days of becoming a medical assistant with the potential to earn $18.00 an hour.

5    (People v. Paulette Regina Villa, et al., slip op. at 3-6.)

6                                ANALYSIS

7   I.  Standards for a Writ of Habeas Corpus

8        Federal habeas corpus relief is not available for any claim decided on the merits in

9   state court proceedings unless the state court's adjudication of the claim:

10
11

       (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

12
13

       (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

14   28 U.S.C. § 2254(d).

15        Under section 2254(d)(1), a state court decision is "contrary to" clearly

16   established United States Supreme Court precedents "if it 'applies a rule that contradicts the

17   governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are

18   materially indistinguishable from a decision'" of the  Supreme Court and nevertheless arrives at

19   different result.  Early v. Packer, 573 U.S. 3, 8 (2002) (quoting Williams v. Taylor, 529 U.S. 362,

20   405-406 (2000)).

21        Under the  "unreasonable application" clause of section 2254(d)(1), a federal

22   habeas court may grant the writ if the state court identifies the correct governing legal principle

23   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

24   prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

25   simply because that court concludes in its independent judgment that the relevant state-court

26   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

1  application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

2  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

3  question, is left with a 'firm conviction' that the state court was 'erroneous.'")

4      The court looks to the last reasoned state court decision as the basis for the state

5  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

6  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

7  habeas court independently reviews the record to determine whether habeas corpus relief is

8  available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

9  II.  Petitioner's Claims

10      A.  Juror Misconduct

11      Petitioner claims juror misconduct violated her constitutional rights.  Petitioner's

12  alleges that one of the jurors lied during voir dire.  Petitioner also alleges juror misconduct by

13  their experimentation and by their use of personal expertise during deliberations.

14      The last reasoned rejection of this claim is the decision of the California Court of

15  Appeal for the Third Appellate District on petitioner's direct appeal.  Petitioner's claims were

16  denied by the California Supreme Court without further comment.  Juror affidavits of some, but

17  not all jurors, were submitted to the trial court following the verdict during petitioner's motion

18  for new trial.  (Reporter's Transcript ("RT") 1508-38.)

19      Jurors No. 2 and No. 5 submitted declarations to the trial court following the

20  verdict (Clerk's Augmentation on Appeal ("CAA"), at 16-22), which were heard by the trial

21  court on defense counsel's motion for new trial.  These declarations read as follows:

22      Juror No. 2

23      1.  I was Juror #2 in *People v. Louis Baca*; Case No. SC61757(C).

24      2.  After two and one-half days of deliberations, I was
    overwhelmed by the experience and stressed out about the fact that
25  I was the lone holdout for not guilty.  I voted to convict [petitioner]
    of First Degree Murder With Special Circumstances in order to be
26  able to get out of the jury room and get it over with.

5

3.  I was not convinced beyond a reasonable doubt that [petitioner] was guilty of First Degree Murder.

4.  After the verdict was read in open court on November 18, 1997, I felt uncomfortable about the fact that I had voted to convict [petitioner] of First Degree Murder despite the fact that I had a reasonable doubt as to his guilt of that charge.

5.  On November 19, 1997, at approximately 3:00 p.m. I attempted to reach Judge Richard Guliani by telephone, but he was unavailable.  I left a message requesting that Judge Guiliani call me back.  Later that afternoon Judge Guliani called me back.  During this telephone conversation, I told Judge Guliani that I felt uncomfortable with the decision that we made on [petitioner]. That I did not feel that it was First Degree Murder, but I did not know ho long I had to hold out in order for it to be considered a hung jury.  I held out for two and one-half days, but I didn't know if that was long enough or if I had to hold our for a week, or a month, or how long I had to hold out.  And that I had said yes to First Degree Murder and I did not really feel that it was First Degree Murder.

        I felt that there was a reasonable doubt as to intent to kill.  I did finally say "yes" in order to be able to get out of the room and get it over with.

6.  I further told Judge Guliani that I went along with the opinion of the other eleven people because there were some very strong personalities who knew a lot about guns and felt that nobody would shoot a gun unless they intended to kill.  I was not convinced of that myself, but I eventually voted "yes" to be able to get it over because I felt very uncomfortable after two and one-half days of deliberations.  It was a very tense situation that was not going anywhere.

7.  I was not convinced beyond a reasonable doubt.  I felt that I had a reasonable doubt of intent to kill and express malice aforethought.

8.  I had learned through casual conversation with Juror #3, that he was a Vietnam veteran.  During deliberations he often expressed the opinion that anyone who points a gun at someone else intends to kill the person.

9.  Juror #4, shared the fact that someone close to him engaged in the sale of firearms.  He claimed to have acquired special knowledge regarding guns as a result of interacting with this person.  He also expressed the opinion that anyone who points a gun a[t] someone else intends to kill that person.  I do not agree with the opinion expressed by jurors #3 and 4.

10.  During the pendency of this matter, the "nanny" case was receiving national media coverage.  During the deliberations Juror #4, said to the other jurors "we have an insurance policy if we make the wrong decision.  The judge will overrule us like the judge in the 'nanny' case.["]

11.  Juror's # 3, 4 and 6 insisted that we only consider Murder in the First Degree and reach a unanimous verdict before we could consider Second Degree Murder or Manslaughter.  I did not agree with this strategy.  I thought that if we all considered Second Degree Murder and reached a unanimous verdict it would be easier for us to deliberate with respect to First Degree Murder.  I suggested to the other jurors that we leave First Degree and consider Second Degree and Manslaughter.  They refused to do so.  One of the jurors said that Second Degree Murder does not apply in this case.  It only applies in cases such as drunk driving with death when no weapon such as a gun is used.

12.  At the end of the day on Friday, November 14, 1997, after two days of deliberations, I told the other jurors that I felt that I wasn't going to change my mind.  I told them that I didn't see anything that would convince me otherwise, that I still had a reasonable doubt, but if they wanted me to vote guilty, I would.

13.  After one-half day of deliberations on Monday, November 17, 1997, I changed my vote from Not Guilty to Guilty because I didn't know how long that I had to hold out to be considered a hung jury, and I was feeling pressure from other people there even though they were not verbally expressing any pressure towards me.  I was feeling pressure to get on with it and that they weren't going to change their minds.  I wasn't going to be able to convince them.  I voted guilty so that we could get it over with.  I voted guilty hoping that Juror # 4 was right when he told us that "If we are wrong the judge will over-rule us."

14.  I am a San Joaquin County employee.  We haven't had a raise in three years.  The County is always saying it's broke, it has no money, and I know the cost to the County of having a re-trial would be very expensive.

15.  At the time of these events, I had submitted an application to be considered for a position as an investigator with the San Joaquin County Welfare Department.  Investigators in the welfare department work directly with the District Attorney's Office in obtaining convictions for welfare fraud and I didn't know how my raising these questions would affect me at a later date if I'm given the investigator position.  I felt that perhaps the people doing the hiring for the County would look at the fact that I caused a hung jury as a reason to not hire me as an Investigator.

/////

1       16.  Ultimately I succumbed to these pressures and voted for guilty
    against my will.

2

3   (Juror No. 2's March 3, 1998 Decl. CAA, at 16-19.)  Juror No. 2 was not asked about nor did she

4   reveal her pending employment application during voir dire or in her questionnaire.  (Aug 2 CT

5   1-15; Aug RT 163, 177; Transcript of November 13, 2003 Interview with Juror No. 2, appended

6   as Exhibit to January 14, 2004 Decl, at 10-11 filed in CIV S-03-1685 DFL JFM.[3])

7       <u>Juror No. 5</u>

8       1.  I was Juror No. 5 in *People v. Louis Baca* No. SC61757 (C).

9       2.  After one and one. . . half days of voting not guilty, I voted to
    convict [petitioner] of First Degree Murder with Special

10      Circumstance.

11      3.  A couple of men with strong personalities claimed to know a lot
    about guns.  Juror No. 3 and Juror No. 4 were very outspoken

12      about their special knowledge regarding guns.

13      4.  I have very limited knowledge regarding guns.  On or about
    November 13, 1997, I asked my son-in-law, who knows more

14      about guns than I do to explain to me how a casing might get
    jammed in a gun.  He provided me with an explanation.  The

15      jamming of casings in a gun were issues discussed during the
    course of deliberations.  I told Juror No. 6, the Jury Foreman, of

16      my discussion with my son-in-law.  He said maybe we should go to
    the judge with this.

17

18      5.  Juror No. 3 and Juror No. 4 expressed the opinion that anyone
    who points a gun at someone else intends to kill that person.  They

19      also said that a person would not have to have a good aim to hit a
    target when firing a handgun.  One would just have to point the

20      handgun in the direction of the target to hit it.  I did not agree with
    either of these opinionis, but I deferred to their claimed superior

21      knowledge about guns.

22      6.  Juror's No. 3 and 4 told us that they had gone home after

23      [3]  In her November 2003 interview, Juror No. 2 stated "As far as my job application there
were no questions on the questionnaire going into that, it was just that I was on a list of eligibles

24  that I was interviewed for a position and I never even considered that until the point after the
verdict.  At the point when we were in deliberation, I'm sorry not after the verdict, but when we

25  were in deliberation and the district attorney . . . I felt that there was a chance that I would not get
a position with the district attorney if I went against the district attorney in that decision."

26  (January 14, 2004 Decl. at 11.)

deliberation and conducted experiments with their own handguns to determine how a casing would jam in their guns.  They shared the results of their experiments with the other Jurors during deliberations the next day.

7.  Juror's 3, 4 and 6 insisted that we only consider Murder in the First Degree and reach a unanimous verdict before we could consider Second Degree Murder or Manslaughter.  I did not agree with this strategy.  I thought that if we all considered Second Degree Murder and reached a unanimous verdict it would be easier for us to deliberate with respect to First Degree Murder.  After one full day of deliberations I went home and asked my husband if he thought that the procedure that these jurors were insisting on was proper.  He told me to ask the judge the next day.  I failed to ask the judge, but I did suggest to the other jurors that we leave First Degree and consider Second Degree and Manslaughter.  They refused to do so.

8.  At one point during the course of deliberations Juror No. 2, who had been voting not guilty said "How can you put a 19 year old boy in prison for the rest of his life."  Juror No. 4 responded by saying "No matter how we vote the judge can change the verdict."  "If we are wrong he can over-rule us."

9.  At one point during the course of deliberations one of the jurors suggested that [petitioner] may have shot Daniel Martinez to be initiated into a gang or to earn his gang colors.

10.  I was not convinced beyond a reasonable doubt that [petitioner] was guilty of First Degree Murder with Special Circumstances when I changed my vote from not guilty to guilty on November 14, 1997.  Nor was I convinced on November 18, 1997 when the verdict was read in open court.  I am not convinced beyond a reasonable doubt that [petitioner] is guilty of First Degree Murder with Special Circumstance even today.

11.  I was persuaded to vote guilty by the strong willed Jurors who caused me to believe that they were more knowledgeable regarding guns and gangs.  Most importantly I decided to vote guilty because I felt secure in the representations of Juror No. 4 that "If we were wrong the judge would overrule us."

(Juror No. 5's March 3, 1998 Decl. CAA, at 20-22.)  The Deputy District Attorney contacted Jurors Nos. 3 and 4 and, after reading to them those portions of the declarations of Jurors 2 and 5 that dealt with allegations concerning gun experiments (RT 1522), invited Jurors Nos. 3 and 4 to respond in their own words if they wanted to respond.  (CAA at 23; 25.)  These jurors sent him

/////

1    their letters, which the Deputy District Attorney filed with the court.  (CAA at 23-26.)  These

2    letters read as follows:

3              Juror No. 4:

4              I'm responding to your call regarding the accusation of juror
               misconduct on the jury I sat on.  First to answer the accusations
5              that I went home and tested or experimented with my own guns.
               At no time did I experiment with my guns.  I also don't recall
6              anyone on the jury saying that they had experimented with their
               guns.
7
               My father's hobby was gunsmithing.  He had a gun shop in the
8              garage where he built guns beginning to end.  I was involved with
               helping him and gained a good degree of knowledge about guns.  I
9              hope this makes it clear that my experimenting would be entirely
               unnecessary.
10
               I do feel that we worked very hard to reach a just and honest
11             verdict.  It seems now that the jury is on trial.  This seems to be a
               travesty of justice to me.  I am very concerned that distortions to
12             what truly happened in the jury room are being considered.

13             I spent nearly a month of my life sitting on that jury.  During that
               time I listened very closely to the courts instructions.  I followed
14             those instructions to the best of my ability and understanding.  I
               also read the instruction we had many times to be certain I made no
15             mistakes in the process.  Again, this was to the best of my ability
               and understanding.  I hope this clarifies for the court any questions
16             regarding my conduct on the jury.

17             I submit this statement under penalty of perjury.

18   (Juror No. 4's Letter, CAA 24.)

19             Juror No. 3:

20             It has come to my attention that certain allegations have been made
               by a juror who I served with sometime in late October and early
21             November.  I wish to clarify that I or no other person as far as I am
               aware, attempted to coerce any jury person or persons at any time
22             during the trial of one Louis Baca and [Paulette Villa].  I wish also
               to make it clear that I at no time during the trial tested or attempted
23             to test how a gun jams.  I do not own, nor have access to any type
               of firearms now or at the time of the trial of Louis Baca.  I wish to
24             make it clear I do not like guns and to the best of my knowledge
               have not touched a gun since the mid 1960s, when I was in the
25             United States Army in 1965.

26   /////

1        The only reference pertaining to a jammed firearm I may have
made was from personal knowledge from those years about how
2        difficult it is to unjam a firearm.  I also wish to make it clear that
the discussions about jammed guns was during the possible guilt of
3        [Paulette Villa] and her involvement in the killing of one David
Martinez and not Louis Baca.  Louis Baca as I recall was only
4        referred to at the first encounter where the gun may have failed to
fire.
5

6        I . . . am making this statement under penalty of perjury of my own
free will.  I am willing to speak to any persons about this matter as
7        long as [Deputy District Attorney] Tom Testa is present during any
questioning.  Please feel free to contact me at any time at . . . .

8  (Juror No. 3's March 11, 1998 Letter, CAA 26.)

9        During argument on defense counsel's motion for new trial, the district attorney

10  recounted two voicemail messages received from two other jurors in this action:

11        Today counsel and The Court listened to an answering machine in
the judge's chambers of [Juror #12], . . .  who apparently
12        telephoned The Court, and I think the record should reflect that she
said in that machine that she felt nothing improper took place
13        during jury deliberations.  There was no coercion.

14        She read a newspaper article about what turns out to be juror
number two's comments, and she on the machine left a message
15        stating, that is, [Juror #12] stating that she felt strongly about this;
that this juror was inaccurate and incorrect and that jurors worked
16        very hard and [Juror #12] felt nothing improper was taking place.

17        Also, I think the record should reflect that The Court can consider
in ruling on these motions the phone message that juror number
18        two left the day – two days after the verdict or whatever that date
was as well as my taped interview with her.  So that is a total of
19        two jurors.

20  (RT at 1520-21.)  Thus, the trial court took into consideration information from five jurors:

21  Jurors Nos. 2, 3, 4, 5 and 12.  (RT at 1521.)  All except Juror No. 12 submitted affidavits or

22  declarations.  (Id.)  After hearing from all counsel, the trial court denied the motion for new trial,

23  as follows:

24        It seems to me that . . . very much of what you're arguing about are
things that are not admissible in the process anyway.  Jurors' thought processes are not fair game
25  The process they use to arrive at their verdicts is not subject of this discussion at all.

26        So if somebody is thinking about a portion of the law that's

1    incorrect, . . . I think would probably happen in any trial, that's not
     something that's going to make any difference.
2
     The law in this case is an awful lot more complex than the cases
3    that we generally see.

4    So insofar as somebody saying, well, you know we've got a safety
     net here or anything of that sort, I don't think that's anything that
5    has to do with the granting of a new trial motion.

6    The things that do have – that are . . . pertinent are whether or not
     somebody – somebody performed an experiment, visited the scene,
7    talked to somebody else, brought that information in the jury room
     and so on.
8
     Whether or not that happened is certainly not clear in this case and,
9    in fact, seems to me that in my view of . . . what I've read, it's
     more probable than not that it didn't happen.
10
     But even if it did happen, you go to another step, whether or not it
11   created prejudice.

12   In view of the . . . quality of the evidence in this case and the
     important – the relative importance of whether or not the gun could
13   have jammed or did jam or whether or not – how that relates to the
     rest of the evidence, in my view does not – it doesn't make very
14   much difference.

15   It doesn't seem to me there's any substantia likelihood at all that
     any juror's vote was swayed by this misconduct, if it happened,
16   and I don't believe that it did.

17   So for those reasons, I'm going to deny the motion.

18
     (RT 1537-38.)
19
           The Sixth Amendment guarantees criminal defendants a verdict by impartial,
20
     indifferent jurors.  The bias or prejudice of even a single juror would violate petitioner's right to
21
     a fair trial.  <u>Tinsley v. Borg</u>, 895 F.2d 520 (9th Cir. 1990).  However, the Constitution "does not
22
     require a new trial every time a juror has been placed in a potentially compromising situation."
23
     <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982).  Jurors have a correlative duty to consider only the
24
     evidence that is presented in open court.  When the jury breaches this duty by considering
25
     extraneous facts not introduced in evidence a defendant has effectively lost the rights of
26

                                                    12

confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence.  <u>Hughes v. Borg</u>, 898 F.2d 695, 699 (9th Cir. 1990).[4]  However, petitioner bears the burden of establishing that a juror's consideration of extrinsic material had a "substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  In <u>Lawson v. Borg</u>, 60 F.3d 608, 612 (9th Cir.1995), the Ninth Circuit set out the standard as follows:

> Jury exposure to facts not in evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment.  However, a petitioner is entitled to habeas relief only if it can be established that the constitutional error had "substantial and injurious effect or influence in determining the jury's verdict."  Whether the constitutional error was harmless is not a factual determination entitled to the statutory presumption of correctness under 28 U.S.C. § 2254(d).

<u>Id.</u>  (Internal citations omitted).

A juror's past personal experiences may be an appropriate part of the jury's deliberations.  <u>U.S. v. Navarro-Garcia</u>, 926 F.2d 818, 821(9th Cir. 1991)  "Jurors must rely on their past personal experiences when hearing a trial and deliberating on a verdict."  <u>Hard v. Burlington No. Railroad</u>, 812 F.2d 482, 486 (9th Cir.1987).  A juror's personal experiences may constitute extrinsic evidence if a juror relays knowledge regarding the parties or the issues involved in the litigation that might affect the verdict.  <u>See</u> <u>Hard</u>, 812 F.2d at 486 (involving a juror who was allegedly a former employee of the defendant railroad, and who allegedly had personal knowledge of the railroad's settlement practices).

### 1. Juror Misconduct During Voir Dire

Petitioner's first juror misconduct claim is that Juror No. 2 lied during voir dire because she failed to disclose that she had a job application pending for employment as an

---

[4]  Although the <u>Hughes</u> court found that constitutional error occurred when a police report not introduced into evidence was accidentally allowed to go to the jury in a kidnap and murder case, it held such error was harmless because of the overwhelming evidence of Hughes' guilt.  <u>Id.</u>

investigator with the welfare department.  Because this position would require Juror No. 2 to work directly with the district attorney's office, petitioner argues Juror No. 2 was biased against her.  Indeed, Juror No. 2 has provided a declaration in which she states she believed she would risk not getting the job if she were the lone hold-out against a first degree guilty verdict.

The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state appellate court addressed this claim as follows:

> During voir dire, the jurors were asked to answer a questionnaire containing a variety of questions designed to uncover potential bias.  The jurors were asked if there was any reason they should not sit on the case or any information they should disclose to the court or the lawyers.  During in-court voir dire, they were provided many examples of situations where disclosure would be required.  One prospective juror was questioned about an acquaintance who is a prison guard and another was asked about a daughter who worked for the Judicial Council.  The prosecutor also gave examples of jurors not mentioning something during voir dire that could be important:  a juror who approached him after trial and said his niece had been killed or a juror who revealed after trial that he was arrested once.

> After a verdict was reached but before judgment and sentencing, juror #2 telephoned the trial judge and indicated she was not convinced beyond a reasonable doubt of Baca's guilt.  She felt pressured to reach a verdict, however, so the jurors could all go home.  She was interviewed by the prosecution and the defense.  She disclosed that she had submitted an application for employment as an investigator with the welfare department.  The position, she believed, would require her to work directly with the district attorney's office.  She also stated she was concerned that being a hold-out juror would jeopardize her chance of getting the job and would negatively impact the public fisc.  The application was not disclosed on juror #2's questionnaire or during voir dire.

> Baca's lawyer requested the court to release the names and personal information about the remaining 11 jurors.  The court denied the request, stating that "[e]ven if what the one juror had said is true, it doesn't appear to the Court that anything improper was done to overbear her will."

> "We begin with the general proposition that one accused of a crime has a constitutional right to a trial by impartial jurors."  (*In re Hitchings* (1993) 6 Cal.4th 97, 110.)  Voir dire examination of prospective jurors is the essential means by which impartiality can

be explored. "The prosecution, the defense and the trial court rely on the voir dire responses in making their respective decisions, and if potential jurors do not respond candidly the jury selection process is rendered meaningless. Falsehood, or deliberate concealment or nondisclosure of fact and attitudes deprives both sides of the right to select an unbiased jury and erodes the basic integrity of the jury trial process." (*People v. Blackwell* (1987) 191 Cal.App.3d 925, 929.)

A juror's responses to inquiries posed during voir dire enables a criminal defendant to exclude a juror for cause or to exercise a peremptory challenge for suspected bias. When jurors violate their oath of full disclosure they commit misconduct. "A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct." (*In re Hitchings, supra*, 6 Cal.4th at p. 111.)

[Petitioner and her co-defendant Baca] maintain that the juror's potential connection to law enforcement is a measure of bias and would have subjected the juror to challenge for cause. They argue, moreover, that a juror's concealment need not be intentional. (*People v. Diaz* (1984) 152 Cal.App.3d 926, 934-935.) *Diaz* has been criticized and distinguished. (*People v. McPeters* 91992) 2 Cal.4th 1148, 1175-1176; *People v. Jackson* (1985) 168 Cal.App.3d 700, 704-706; *People v. Kelly* (1986) 185 Cal.App.3d 118, 126.)

"Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect. '[T]he proper test to be applied to unintentional "concealment" is whether the juror is sufficiently biased to constitute good cause for the court to find under Penal Code sections 1089 and [former] 1123 that he is unable to perform his duty.' (*People v. Jackson* (1985) 168 Cal.App.3d 700, 706.)" (*People v. McPeters, supra*, 2 Cal.4th at p. 1175.) We must determine whether the trial court abused its discretion in finding no misconduct. (Id. at p. 1175.)

We begin by pointing out the general nature of the questions posed the jurors during written and oral voir dire. It is not surprising that a juror might neglect to disclose a pending application to become a welfare investigator when asked the broad question as to whether she had any information she believed she should disclose. While the jurors were admonished to disclose whether they had been victims of a crime or were related to someone who was and other specific questions designed to disclose bias or a conflict, they were not asked any specific questions about prospective employment. We disagree with [petitioner and her co-defendant] that the examples provided by the court and the prosecution would have

1    alerted juror #2 to disclose the application.  The possibility that the
juror might get the job and might have to work with the district
2    attorney's office was too attenuated to infer that the juror
intentionally concealed information regarding her application,
3    particularly in the absence of any specific questions designed to
elicit such information.  (*People v. Majors* (1998) 18 Cal.4th 385,
4    417-420.)  We do agree with [petitioner and her co-defendant] that
the juror's comment that her hesitancy to hold out any longer was
5    attributable, at least in part, to the impact it would have on her
pending application comes perilously close to demonstrating actual
6    bias.  Nevertheless, since "the trial judge is in the best position to
assess the state of mind of a juror or potential juror on voir dire
7    examination" (*People v. McPeters, supra,* 2 Cal.4th at p. 1175), we
cannot say the court abused its discretion in finding there was no
8    intentional concealment and no actual bias.

9    None of juror #2's comments regarding her post-conviction second
thoughts about the propriety of the verdict were admissible,
10   including her concerns about the expense of a retrial if the jury
hung.  They constitute impermissible inquiry into the thought
11   processes of individual jurors during deliberations.  (*In re
Hamilton* (1999) 20 Cal.4th 273, 294.)  As to whether she was
12   improperly coerced into changing her vote to reach a unanimous
verdict, we agree with the trial court that her testimony revealed
13   her own inner turmoil rather than improper badgering from the
other jurors.

14

15   (People v. Villa, slip op. at 10-14.)  Petitioner's claims were denied by the California Supreme

16   Court without further comment.

17          The United States Supreme Court has examined whether a habeas petitioner's

18   right to an impartial jury was violated where a juror submitted an application for employment as

19   an investigator in the District Attorney's Office during the petitioner's trial.  Smith v. Phillips,

20   455 U.S. 209, 212 (1982).  Smith argued that "[g]iven the human propensity for self-justification

21   . . . the law must impute bias to jurors in [such a] position."  Id. at 215.  The Supreme Court

22   disagreed, explaining that it had "long held that the remedy for allegations of juror partiality is a

23   hearing in which the defendant has an opportunity to prove actual bias."  Id.; see also id. at

24   215-17 (discussing Chandler v. Florida, 449 U.S. 560 (1981), Remmer v. United States, 347 U.S.

25   227 (1954), and Dennis v. United States, 339 U.S. 162 (1950)).

26   /////

1      In the instant case, the trial judge held a hearing on petitioner's motion for new

2   trial at which time he considered the declaration of Juror No. 2 and decided there had been no

3   actual bias.  (RT 1508-1538; CT 708-713.)  Although petitioner contends the trial judge should

4   have held an evidentiary hearing to further inquire of Juror No. 2, based on the record at hand,

5   this court cannot find that such an evidentiary hearing would have been fruitful.

6      Moreover, this court cannot find that the trial judge's failure to hold an

7   evidentiary hearing states a constitutional violation under AEDPA.  "Clearly established federal

8   law, as determined by the Supreme Court, does not require state or federal courts to hold a

9   hearing every time a claim of juror bias is raised."  Tracey v. Palmateer, 341 F.3d 1037, 1045

10  (9th Cir. 2003), cert. denied, Tracey v. Belleque, 125 S.Ct. 196 (2004).  Thus, this court cannot

11  find that the trial judge's refusal to hold an evidentiary hearing at which he would question any or

12  all of the jurors was contrary to or an unreasonable application of clearly established federal law.

13     Even if this court considered the evidence presented by Juror No. 2, petitioner

14  would not be entitled to relief.  The evaluation of such claims of juror misconduct proceeds

15  according to a two-part test:  (1) whether a juror failed to answer honestly a material question on

16  voir dire; and (2) whether a correct answer would have provided a valid basis for a challenge for

17  cause.  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984).[5]

18     No evidence has been presented indicating Juror 2 lied during voir dire.  No one

19  asked the potential jurors questions concerning prospective employment.  Petitioner has failed to

20  present evidence indicating Juror No. 2 intentionally kept this pending employment application

21  secret.  In her 2003 interview, Juror No. 2 confirmed that during voir dire it did not occur to her

22  that her pending job application would pose a problem with her deciding guilty or not guilty.

23  (January 14, 2004 Decl. at 21 filed in CIV S-03-1685.)

24     Furthermore, petitioner fails to show Juror No. 2 would have been excused for

25  _____

26     [5]  This standard applies in civil and criminal cases.  See id.; United States v. Aguon, 851
    F.2d 1158, 1170 (9th Cir.1988) (en banc).

cause had the court been informed of her pending employment application. Juror No. 2 had applied for a position as a welfare investigator with the welfare department. (Id. at 11.) If Juror No. 2 had noted her pending application with the welfare department, it is not clear a follow-up question would have been asked or whether Juror No. 2 would have volunteered the fact that the new job would require her to work closely with the district attorney's office.

Moreover, Juror No. 2's job application was pending; there was no guarantee or certainty that Juror No. 2 would get the position. Indeed, Juror No. 2 was subsequently interviewed twice and was not offered the position. (Id. at 21.) Just because Juror No. 2 would potentially have been required to work closely with the district attorney's office does not mean she could not impartially serve as a juror in this case. Only those reasons that affect a juror's impartiality can be said to affect the fairness of a trial. McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556 (1984). There is no evidence that Juror No. 2's chances of getting the position would have been affected by her service on the jury, even had she held out against a first degree murder conviction. Juror No. 2's misapprehension that it would goes to her mental processes in reaching the verdict which this court may not consider. Cal. Evid. Code § 1150;[6] Fed. R. Evid. 606(b). The 2003 interview of Juror No. 2 confirms this:

> Q: "Was it ever brought to your attention that if you didn't vote a certain way that this might affect your job, by anybody?"
>
> A: "No. It was not; it was just in my mind."
>
> Q: "It was never inferred to you or anything else like that?
>
> A: "No, it was not."

(January 14, 2004 Decl. at 12, filed in CIV S-03-1685.)

---

[6] "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Id.

Moreover, it appears that most of Juror No. 2's qualms over the verdict were her second thoughts about having voted guilty of first degree murder.  The bulk of her declaration focuses on how she felt pressured to join the other jurors in their guilty votes and how she just wanted to "get out of there."  Her mention of her pending job application long after voir dire and after days of jury deliberation also struck the district attorney as incredible.  (RT at 1523-24.)  In her 2003 interview, Juror No. 2 confirmed she wanted to "get out of there."  (January 14, 2004 Decl. at 17, filed in CIV S-03-1685.)  She also explained why she changed her vote:

> Q:  "You finally succumbed if you will for lack of a better word to what was it exactly why you changed your mind?"

> A:  "Just because I wanted to get out of that deliberation room; the judge did not tell us and I thought that, I've never served on a trial before obviously, but I thought after so many days of not coming up with a decision that the judge would declare that we were deadlocked I did not realize that I was the one who would have to declare that we were deadlocked because the jury foreman was not going to and I didn't realize that I was going to have to declare that and so after four days of people going like this at me. . . "

> Q:  "Just for the record you were basically demonstrating your arms crossed and kind of glaring."

> A:  "Yes.  Yes, and it was just before Thanksgiving and people wanted to go home for Thanksgiving they didn't want to think about this trial anymore.  I was spending a lot of time in the restroom crying because I felt like I was the only one that was not."

> Q:  "When you say that you were the one that was going to have to basically tell the judge that you deadlocked does this go back to your earlier statement about maybe there being some reprisal or some issue with you maybe getting your job later on?"

> A:  "I don't think I was thinking about it at that point, no."

> Q:  "But it was an issue before?"

> A:  "Yes."

> Q:  "And it was an issue in your overall decision-making process?"

> A:  "Yes.  And I finally told them after being in there for four days with them and people saying 'well lets get on with it because we still have this other codefendant that we have to come up with a decision on and we haven't even made a decision and we still have

19

1  to get this done' and after four days of all of this I finally said I will
2  vote guilty if that's what you want me to do, but I do not feel that
   he is guilty of first-degree murder and I did say that."

3  (Id., at 15-16.)

4  Q:  "However during the proceedings it came to your mind that you
   would be applying for a position and that it might affect your job?"

5
6  A:  "Yes."

7  Q:  "Do you think that at that time it had an effect on your decision
   other than the glaring and staring by the jurors I mean was it a
   combination of?"

8
9  A:  "It could have been, yes."

10  (Id., at 21.)  Although petitioner argues that "due in substantial part to [Juror No. 2's] fear that

11  she would not get the job if she held out, she caved into the pressure being exerted by the

12  majority of jurors and voted for first degree murder" (Points and Authorities in Support of

13  Traverse at 8), it is just as likely that Juror No. 2 simply felt pressure from the other jurors

14  because she was the sole holdout juror and changed her vote because she wanted to get out of

15  there.

16  Juror No. 2 still had the remainder of the deliberations period on petitioner's guilt

17  in which to voice her change of heart as to her vote on petitioner's guilt or to notify the court of

18  her perceived conflict with her pending job application.  Juror No. 2 did neither.  Juror No. 2 also

19  had further opportunity to alert the court when the jurors were individually polled after the

20  verdict was announced.  Juror No. 2 did not; rather, she confirmed her guilty vote on first degree

21  murder with special circumstance.

22  After the verdict was rendered and Juror No. 2 had an opportunity to discuss her

23  situation with her co-worker and others, her co-worker encouraged her to call the trial judge.  (Id.

24  at 18.)  She recalled she told the trial judge she only voted because she "felt pressured to vote for

25  first degree [rather than] second degree."  (Id. at 19.)

26  /////

1    In light of this record, this court cannot find that the state court's decision that

2  there was no intentional concealment and no actual bias on the part of Juror No. 2 was contrary

3  to, or an unreasonable application of, applicable federal law.

4    2.  Juror Experiment or Expertise

5    Petitioner contends that the jury was tainted by extrinsic evidence when certain

6  jurors conducted experiments with guns at home and then shared the results of those experiments

7  with the other jurors during deliberations.  Petitioner also contends it was misconduct for the jury

8  to share their personal expertise concerning weapons with the other jurors.

9    Juror No. 5 stated that Jurors No. 3 and 4 informed the jury that they had gone

10  home after deliberation and conducted experiments with their own handguns to determine how a

11  casing would jam in their guns and shared the results with the jury.  (Juror No. 5's March 3, 1998

12  Decl., CAA at 21.)  However, Jurors No. 3 and 4 both denied conducting experiments and

13  relayed the basis of their personal knowledge concerning weapons.  (Letters from Jurors Nos. 3

14  & 4, CAA at 24, 26.)

15    Petitioner raised this particular claim on appeal.  The state appellate court found

16  there was substantial evidence such experimentation did not occur based on the two accused

17  jurors' express denials.  (People v. Villa, slip opinion at 14.)  The appellate court then confirmed

18  that there was no substantial likelihood any experimentation caused juror bias:

19    Moreover, the trial court also found that any possible misconduct
    would not have had a substantial likelihood of influencing the vote
20    of any of the jurors.  We recognize that "the test for determining
    whether juror misconduct likely resulted in actual bias is 'different
21    from, and indeed less tolerant than,' normal harmless error
    analysis, for if it appears substantially likely that a juror is actually
22    biased, we must set aside the verdict, no matter how convinced we
    might be that an unbiased jury would have reached the same
23    verdict."  (In re Carpenter, supra, 9 Cal.4th at p. 654.)

24    Villa testified she had no familiarity with guns, but that Baca
    complained the gun was jammed.  The issue before the jury was
25    her mental state, not how the gun might have been jammed or
    cleared.  She would have us believe that she, relying on Baca's
26    statement the gun was jammed, thought the victims were insulated

1

2

3

4

                    from harm.  Since her mental state was independent of her
knowledge about the gun any experimentation regarding its
operation was immaterial.  The likelihood of bias arising from any
experimentation must be substantial.  We accept the trial court's
determination there was no substantial likelihood any
experimentation caused juror bias.

5     (People v. Villa, slip op. at 14-17.)

6             As noted by the state court, this case turned on petitioner's mental state.  There

7     was no question she drove the car.  Even if the jurors had performed these experiments and

8     shared the results with other jurors, petitioner has failed to demonstrate that the juror's

9     consideration of that extrinsic material had a "substantial and injurious effect or influence in

10    determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

11            In addition, it was not error for the jurors to discuss their personal knowledge and

12    opinions about how a weapon jams.  The Ninth Circuit has held that "a juror's past personal

13    experiences may be an appropriate part of the jury's deliberations."  Grotemeyer v. Hickman, 393

14    F.3d 871, (Dec. 15, 2004) (quoting United States v. Navarro-Garcia, 926 F.2d 818, 821 (9th

15    Cir.1991).

16                     3.  Remainder of Jurors' Declarations

17            The affidavits from the jurors indicate that during deliberations, some jurors

18    discussed petitioner's failure to testify or misunderstood certain legal matters.  Federal Rule of

19    Evidence 606(b) precludes inquiry into the thought processes of jurors during deliberation.[7]  This

20    rule applies to petitions for habeas corpus from state court prisoners.  See Fed. R. Evid. 1101(e).

21

22         [7]   Rule 606(b) reads:  Upon an inquiry into the validity of a verdict or indictment, a juror

23    may not testify to any matter or statement occurring during the course of the jury's deliberations
or to the effect of anything upon that or any other juror's mind or emotions as influencing the

24    juror to assent to or dissent from the verdict or indictment or concerning the juror's mental
processes in connection therewith, except that a juror may testify on the question whether

25    extraneous prejudicial information was improperly brought to the jury's attention or whether any
outside influence was improperly brought to bear upon any juror.  Nor may a juror's affidavit or

26    evidence of any statement by the juror concerning a matter about which the juror would be
precluded from testifying be received for these purposes.

1    Jurors' statements have traditionally been inadmissible to impeach the verdict.  <u>Tanner v. United</u>

2    <u>States</u>, 483 U.S. 107, 115 (1987).  As recognized above, the rule has an exception for statements

3    alleging that a jury has been subject to "extraneous influence."  <u>Id.</u>  The jury's privacy should be

4    violated only to redress acts which themselves violate that privacy.  <u>Id.</u>

5          Where it is alleged that a juror's statement demonstrates that the jury

6    misunderstood the law, that statement cannot be used to attack the verdict.  <u>See</u> <u>United States v.</u>

7    <u>Span</u>, 75 F.3d 1383, 1390 n.8 (9th Cir.1996).  Nor may a defendant offer jurors' statements to

8    establish motives of individual jurors and preconceived notions as to a defendant's guilt.  <u>See</u>

9    <u>United States v. Davis</u>, 960 F.2d 820, 828 (9th Cir.), <u>cert.</u> <u>denied</u>, 506 U.S. 873 (1992); United

10   <u>States v. Pimentel</u>, 654 F.2d 538, 542 (9th Cir.1981).

11         Absent an allegation that extraneous prejudicial information was brought to the

12   jury's attention, this court may not review the jury's deliberative process.  Petitioner's allegations

13   concerning the jurors' discussion of his failure to testify or their misunderstanding about what

14   order to consider the criminal charges must therefore be rejected.

15         In light of the above, petitioner's claims of juror bias and/or misconduct should be

16   denied.

17         B.  <u>Sufficiency of the Evidence</u>

18         Petitioner claims that the evidence was insufficient to support her conviction

19   under an aiding and abetting theory.  This claim was rejected by the California Court of Appeal

20   in a written decision on petitioner's direct appeal, and by the California Supreme Court without

21   comment on habeas review.  (<u>See</u> Exs. D, E to Answer.)  After setting forth the applicable legal

22   principles, the court will evaluate this claim below.

23         1.  <u>Legal Standards</u>

24         When a challenge is brought alleging insufficient evidence, federal habeas corpus

25   relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

26   more favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond

a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Under Jackson, the court

must review the entire record when the sufficiency of the evidence is challenged on habeas.

Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d

722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to 'resolve

conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic

facts to ultimate facts."  Jackson, 443 U.S. at 319.  "The question is not whether we are

personally convinced beyond a reasonable doubt.  It is whether rational jurors could reach the

conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The

federal habeas court determines sufficiency of the evidence in reference to the substantive

elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16.

Petitioner argues, as she did on direct appeal, that the evidence was insufficient to

support her conviction under an aiding and abetting theory.  Petitioner contends she did not have

the subjective intent required to find her guilty under this theory.

The California Court of Appeal addressed this claim as follows:

In *People v. Prettyman* (1996) 14 Cal.4th 248, the Supreme Court reiterated the well-established principle that "a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the 'natural and probable consequence' of the target crime." (Id. at p. 261.) "'[W]hen an accomplice chooses to become a part of the criminal activity of another, she says in essence, "your acts are my acts," and forfeits her personal identity.  We euphemistically may impute the actions of the perpetrator to the accomplice by "agency" doctrine; in reality, we demand that she who chooses to aid in a crime forfeits her right to be treated as an individual.' [Citation.]" (*Id*. at p. 259.)

"It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator.  His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator.  It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which *[People v.] Beeman* [(1984) 35 Cal.3d

24

547, 556] holds must be found by the jury." (*People v. Croy* (1985) 41 Cal.3d 1, 12, fn.5.)  Thus, under *Croy*, a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the 'natural and probable consequence' of the target crime." (*People v. Prettyman, supra*, 14 Cal.4th at p. 261.)

Villa reiterates the same story she told, and her able lawyer argued, to the jury.  She again maintains there is insufficient evidence she knew Baca was going to shoot a gun from her car and that she intended to facilitate the shooting.  She claims she did not know Baca's background, did not know his proclivity toward violence, did not know he would shoot and did not know the gun would fire.  According to Villa, she certainly did not intend to assist her cousin's fatal act.  She would have us believe that, ignorant about the nuances of the gang culture and the operation of firearms, she was a naive young mother merely attempting to establish a relationship with a cousin she barely knew.  What he did purportedly came as a complete surprise to her.

The jury, however, was free to reject her testimony and to draw inferences to the contrary.  (*People v. Morales* (1993) 19 Cal.App.4th1383, 1391.)  Indeed, there was compelling evidence Villa had very intimate knowledge of gang behavior.  Her brother had been stabbed by a member of a Tracy gang and her ex-husband was a member of a gang in Fremont.  The jury heard evidence that Villa had, on a prior occasion, yelled "Fremont" out her window while driving in Tracy.  More specifically, she knew Baca had a gun because she had given it back to him and she observed him assault three unwitting pedestrians in an unprovoked confrontation before the shooting.  If she had harbored any false illusion that her tattoo-bearing cousin was placid and peace-loving, the illusion certainly vanished when he pulled out the gun and stuck it in the victims' faces shouting his gang mantra, "Decoto."

Moreover, the jury had the prerogative to consider her own incriminating behavior, which surely facilitated the shooting.  She initiated the first confrontation by making a U-turn and driving up to three people innocently walking up the street.  She returned to the same area after buying her underage cousin some beer even though it was not en route to her house.  Having passed the trio again, she made another U-turn at her cousin's urging and drove slowly along the field where they began to run.  Worse yet, after Baca fired, she did not immediately leave the area but instead drove along a route which gave Baca yet another opportunity to shoot and two more shots were fired.  The following day, she attempted to remove any evidence from her car.

We conclude there was ample evidence from which the jury could decide she knew her cousin, a gang member, was armed and

dangerous, she intended to assist him shoot at the victim by driving
in close proximity to them, and she did in fact facilitate the
shooting and ultimate murder of Pelon.  Nevertheless, like the
defendant in *People v. Montes* (1999) 743 Cal.App.4th 1050,
relying on *People v. Butts* (1965) 236 Cal.App.2d 817, Villa claims
she cannot be held responsible for Baca's act of shooting.  In
language equally apt to the case before us, Justice William
Bedsworth distinguished *Butts* in light of the development of the
sad social phenomenon, the modern street gang.

The court concluded: "*Butts* is also more than three decades old, a
remnant of a different social era, when street fighters commonly
relied on fists alone to settle disputes.  Unfortunately, as this case
illustrates, the nature of modern gang warfare is quite different.
When rival gangs clash today, verbal taunting can quickly give way
to physical violence and gunfire.  No one immersed in the gang
culture is unaware of these realities, and we see no reason the
courts should turn a blind eye to them.  Given the great potential
for escalating violence during gang confrontations, it is immaterial
whether *Montes* specifically knew Cuevas had a gun." (*Montes*,
*supra*, 74 Cal.App.4th at p. 1056.)  Here, the jury heard evidence
even more compelling, since Villa knew Baca had a gun and had
observed him threaten the victims with it.  The evidence surpasses
even the most conservative measure of substantiality.

People v. Villa, slip op. at 6-9.

After reviewing the record, this court finds that the state court's conclusion that

there was sufficient evidence to establish petitioner's guilt beyond a reasonable doubt is not an

unreasonable application of the federal due process standards set forth above.  Applying the

substantive elements of the criminal offense as defined by state law, a rational juror could have

found that petitioner knowingly assisted her co-defendant Baca in committing criminal acts.

Accordingly, this claim should be denied.

   C.  Jury Instruction Errors

Petitioner raises two claims of jury instruction error.  After setting forth the

applicable legal principles, the court will analyze these claims in turn below.

   1.  Legal Standards

In general, a challenge to jury instructions does not state a federal constitutional

claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456

1  U.S. 107, 119 (1982)); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to

2  warrant federal habeas relief, challenged jury instructions "cannot be merely 'undesirable,

3  erroneous, or even "universally condemned,"' but must violate some due process right

4  guaranteed by the fourteenth amendment."  <u>Prantil v. California</u>, 843 F.2d 314, 317 (1988)

5  (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973)).  To prevail on such a claim petitioner

6  must demonstrate "that an erroneous instruction'so infected the entire trial that the resulting

7  conviction violates due process.'" <u>Prantil</u>, 843 F.2d at 317 (quoting <u>Darnell v. Swinney</u>, 823 F.2d

8  299, 301 (9th Cir. 1987)).  <u>See</u> <u>also</u> <u>Estelle</u>, 502 U.S. at 72.  In making its determination, this

9  court must evaluate the challenged jury instructions "'in the context of the overall charge to the

10 jury as a component of the entire trial process.'"  <u>Prantil</u>, 843 F.2d at 817 (quoting <u>Bashor v.</u>

11 <u>Risley</u>, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where the challenge is to a refusal or failure to

12 give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an

13 incomplete instruction, is less likely to be prejudicial than a misstatement of the law."

14 <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977).  <u>See also</u> <u>Villafuerte v. Stewart</u>, 111 F.3d 616,

15 624 (9th Cir. 1997).

16         2.  <u>Unanimity Jury Instruction</u>

17       Petitioner contends she was denied her rights to due process and a fair trial when

18 the trial court committed reversible error by failing to give a unanimity instruction (CALJIC No.

19 17.01).[8]  This claim was rejected by the California Court of Appeal in a written decision on

20 petitioner's direct appeal, and by the California Supreme Court without comment on habeas

21 review.  (<u>See</u> Exs. C, G to Answer.)

22 _____

23     [8]  CALJIC No. 17.01 reads as follows:  "The defendant is accused of having committed
   the crime of _____ [in Count _____].  The prosecution has introduced evidence for the
   purpose of showing that there is more than one [act] [or] [omission] upon which a conviction [on

24 Count _____] may be based. Defendant may be found guilty if the proof shows beyond a
   reasonable doubt that [he] [she] committed any one or more of the [acts] [or] [omissions].

25 However, in order to return a verdict of guilty [to Count _____], all jurors must agree that [he]
   [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary

26 that the particular [act] [or] [omission] agreed upon be stated in your verdict." <u>Id.</u>

1    The California Court of Appeal concluded that a unanimity instruction was not

2 required in this case because the acts identified by petitioner were relevant in determining her

3 knowledge and intent, not on whether petitioner committed certain acts.  The appellate court

4 explained as follows:

> Villa . . . claims the prosecutor identified four separate acts that she
> undertook to support the actus reus element of the aiding and
> abetting charge, and yet the jury was not instructed to agree on
> which of these acts constituted the offense.  She misconstrues the
> prosecutor's argument.
>
> In rebuttal, the prosecutor discussed Villa's participation in the
> drive-by shooting.  He pointed out that she drove Baca to the store
> knowing he had a gun, continued to drive him after he took out the
> gun during the first confrontation, made a U-turn to confront them
> again knowing "there's a maniac in her car with a gun," and then
> circled the block to allow him to fire a second and third time.  The
> prosecutor was not, as Villa insists, identifying four separate acts,
> any one of which would constitute the actus reus of aiding and
> abetting the shooting.  Quite clearly, he was simply marshalling the
> circumstantial evidence that Villa knew Baca was going to shoot
> ad that she intended to help him.  From these various acts, the
> prosecutor urged the jury to infer knowledge and intent.  Since the
> argument, in context, relates to Villa's intent, not acts, the
> unanimity instruction was unnecessary.

16 (People v. Villa, slip op. at 20-21.)

17    The requirement that a jury in a federal criminal case cannot convict unless it

18 unanimously finds that the Government has proved each element of the charged offense beyond a

19 reasonable doubt is a fundamental principle of criminal jurisprudence.  See Richardson v. United

20 States, 526 U.S. 813, 817 (1999); Schad v. Arizona, 501 U.S. 624, 634 n.5 (1991).  However, the

21 unanimity requirement attaches only to the elements of a charged offense and not to the facts that

22 constitute those elements.  Richardson, 526 U.S. at 817-18.  In other words, jurors need not agree

23 on the manner in which a defendant violates a criminal statute so long as they unanimously agree

24 that the elements of the charged crimes have been proven beyond a reasonable doubt.  Id. at 817

25 ("a federal jury need not always decide unanimously which of several possible sets of underlying

26 brute facts make up a particular element, say, which of several possible means the defendant used

1   to commit an element of the crime"); <u>Schad</u>, 501 U.S. at 631-32 ("different jurors may be

2   persuaded by different pieces of evidence, even when they agree upon the bottom line.  Plainly

3   there is no general requirement that the jury reach agreement on the preliminary factual issues

4   which underlie the verdict."); <u>McKoy v. North Carolina</u>, 494 U.S. 433, 449 (1990) (Blackmun, J.

5   concurring); <u>see also United States v. Kim</u>, 196 F.3d 1079, 1083 (9th Cir. 1999) (under <u>Schad</u> "it

6   was not necessary for the jurors in this case to unanimously agree on a specific classification of

7   Kim's conduct . . . [or] specify which conduct led them to conclude that Kim was an accessory.

8   All that was necessary was a unanimous decision that Kim knowingly and intentionally helped

9   Park in the possession of stolen goods"); <u>United States v. McCormick</u>, 72 F.3d 1404, 1409 (9th

10  Cir.1995).

11          In the ordinary case, a specific unanimity instruction is required only when "there

12  is a genuine possibility of jury confusion or that conviction may result from different jurors

13  concluding that the defendant committed different acts."  <u>United States v. Echeverry</u>, 719 F.2d

14  974 (9th Cir. 1983) (concluding that potential for such confusion exists when the jury presents

15  questions indicating their confusion concerning multiple conspiracies).  Juror confusion is a

16  genuine possibility when the nature of the evidence is complex, when there is a discrepancy

17  between the evidence and the indictment, or where some other particular factor creates such a

18  possibility of confusion.  <u>United States v. Frazin</u>, 780 F.2d 1461, 1468 (9th Cir. 1986).[9]

19          In this case, there was no confusion regarding which acts committed by petitioner

20  formed the basis of the charge of aiding and abetting Baca.  As explained by the California Court

21  of Appeal, the prosecutor clearly explained to the jury that each of the four acts of petitioner

22  demonstrated her intent to assist Baca.  The state court's findings are not based on a unreasonable

23  determination of the facts.  <u>See</u> 28 U.S.C. § 2254(d).  Under these circumstances, there was no

24

25          [9] A state criminal defendant in a noncapital case has no federal constitutional right to a
    unanimous jury verdict.  <u>Apodaca v. Oregon</u>, 406 U.S. 404, 410-12 (1972); <u>Schad</u>, 501 U.S. at
26  637.  However, due process demands a certain "verdict specificity."  <u>Schad</u>, 501 U.S. at 637.

1   "genuine possibility of jury confusion or that conviction may result from different jurors

2   concluding that the defendant committed different acts." Echeverry, 719 F.2d at 974.  A special

3   unanimity instruction is only required when the circumstances indicate jury confusion. Id.  That

4   is not the case here.  The facts of this case were not particularly difficult or complex.

5           An instruction that a unanimous verdict is required is sufficient to ensure

6   unanimity in the ordinary case.  See United States v. Ferris, 719 F.2d 1405, 1407 (9th Cir. 1983).

7   Petitioner's jury received a general unanimity instruction, as follows: "Before you may return a

8   verdict in this case, you must agree unanimously, not only as to whether the defendant is guilty or

9   not guilty, but also, if you should find him or her guilty of an unlawful killing, you must agree

10  unanimously as to whether he or she is guilty of the murder of the first degree or murder of the

11  second degree or voluntary or involutnary manslaughter." (RT 1453.)  That instruction was

12  sufficient to apprise the jury of the requirement of unanimity.  Accordingly, this claim should be

13  denied.

14                  3.  Lesser Included Offense

15          Petitioner claims that the trial court erred in failing to give an instruction on the

16  lesser included offense of voluntary manslaughter.

17          The state appellate court addressed this claim as follows:

18      Villa also asserts the trial court committed reversible error by
        failing to instruct the jury sua sponte on the lesser included offense
19      of voluntary manslaughter.  She finds the error particularly bitter
        because the voluntary manslaughter instruction was given to the
20      jury on behalf of her co-defendant.  We conclude there was no
        error.
21
        Villa relies on People v. Barton (1995) 12 Cal.4th 186, arguing she
22      was entitled to a voluntary manslaughter instruction even though
        she did not rely on such a theory at trial.  The Supreme Court found
23      once again that "[a] trial court's sua sponte duty to instruct on
        lesser included offenses arises, however, not from the arguments of
24      counsel but from the evidence at trial.  'The jury should not be
        constrained by the fact that the prosecution and defense have
25      chosen to focus on certain theories.' [Citation.]  The trial court
        must instruct on lesser included theories when there is substantial
26      evidence to support the instruction, regardless of the theories of the

                                        30

case proffered by the parties.  Here, as set forth above, the evidence supported an instruction on voluntary manslaughter as a lesser included offense, notwithstanding the arguments of the prosecution and defense."  (*Id.* at p. 203.)

Villa points to the neighbor, Mrs. Gaarde, who was able to identify voices, tones, direction and speed all while lying in bed.  Mrs. Gaarde was able to testify with remarkable precision that she heard loud female and male voices arguing at the time of the first confrontation between Baca and Pelon, Celina and Marie.  This evidence, coupled with the prior stabbing of her brother, according to Villa, constitutes substantial evidence of provocation sufficient to trigger the trial court's sua sponte obligation to instruct on voluntary manslaughter.

Villa ignores, however, her own testimony to the contrary.  She, like Celina and Marie, testified there was no argument.  None of the participants in the encounter heard the loud voices Mrs. Gaarde described.  Hence, Villa urges on appeal a theory not just inconsistent with her defense at trial but in direct contradiction to her testimony.  We embrace the logic of *People v. Sinclair* (1998) 64 Cal.App.4th 1012 on similar facts.

Sinclair, like Villa, was convicted of second degree murder.  He too testified at trial.  He testified he did not fire the fatal shot, but on appeal he urged the court had a sua sponte obligation to instruct on voluntary manslaughter.  Following an extensive analysis of relevant authority, including *Barton, supra,* 12 Cal.4th 186, the court concluded "the duty to instruct on inconsistent defenses does not extend to cases such as this where the sworn testimony of the accused completely obviates any basis for finding a lesser included offense."  (*People v. Sinclair, supra,* 64 Cal.App.4th at pp. 1021-1022.)

Here, too, Villa's sworn testimony negated both elements of voluntary manslaughter; that is, adequate provocation and heat of passion.  We need not reiterate the compelling analysis provided by the court in *Sinclair*.  Suffice it to say, the absence of an instruction on a lesser included offense no reasonable juror could find based on [petitioner's] sworn testimony was no error but rather ensured the judicial process was a "forum for the discovery of truth" and not one of the notorious "gambling halls" condemned in the reported cases.  (*People v. Barton, supra,* 12 Cal.4th at p. 196.)

(People v. Villa, slip op. at 18-20.)

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction.  See Beck v. Alabama, 447 U.S. 625, 638 (1980).  The Supreme Court has not

1   decided whether this rationale also extends to non-capital cases.  See Turner v. Marshall, 63 F.3d

2   807, 818 (9th Cir. 1995), overruled on other grounds by Tolbert v. Page, 182 F.3d 677 (9th Cir.

3   1999).  The Ninth Circuit, like several other circuits, has declined to extend Beck to find

4   constitutional error arising from the failure to instruct on a lesser included offense in a

5   non-capital case.  See Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998); Turner, 63 F.3d

6   at 819 (citing Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984)).

7            The trial court's refusal to give an instruction on the lesser included offense of

8   involuntary manslaughter did not rise to the level of a constitutional error for which federal

9   habeas relief is available because petitioner's trial was not a capital case.  To find a constitutional

10  right to a lesser-included offense instruction in this non-capital case would require the

11  application of a new rule of law, which the court may not do in a habeas proceeding under

12  Teague v. Lane, 489 U.S. 28 (1989).  See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000)

13  (habeas relief for failure to instruct on lesser included offense in non-capital case barred by

14  Teague because it would require the application of a new constitutional rule); Turner, 63 F.3d at

15  819 (same).  Under these circumstances, the decision of the California courts denying petitioner

16  relief as to this claim was not contrary to federal law as set forth in the decision in Beck.

17          Even if the Beck rule could be expanded to include a duty to instruct on lesser

18  included offenses in non-capital cases, petitioner has not shown that the refusal to give the

19  suggested jury instruction amounted to constitutional error in this case or rendered her trial

20  fundamentally unfair.  The California Court of Appeal rejected this claim on state law grounds.

21  The conclusion by the state appellate court is not based on an unreasonable determination of the

22  facts in this case, nor is it contrary to or an unreasonable application of clearly established federal

23  law.  Under federal law, a lesser included offense instruction should be given "if the evidence

24  would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of

25  the greater."  Hopper v. Evans, 456 U.S. 605, 612 (1982) (quoting Keeble v. United States, 412

26  U.S. 205, 208 (1973)).  Put another way, a lesser included offense instruction is not necessary

1  where the evidence is such that "[a] rational jury could not have convicted [the defendant] of any

2  lesser-included offense without relying on the precise evidence which establishes guilt of the

3  offenses charged."  United States v. Linn, 880 F.2d 209 (9th Cir.1989), abrogated on other

4  grounds by Florida v. White, 526 U.S. 559 (1999).  Here, as explained by the state court, a

5  petitioner's sworn testimony obviated any basis for finding a lesser included offense.

6  Accordingly, the trial judge did not err in failing to instruct the jury on the lesser-included

7  offense.

8        IT IS HEREBY ORDERED that the Clerk of the Court shall file a copy of the

9  November 14, 2003 interview transcript of Juror No. 2, filed in Baca v. Knowles, CIV S-03-1685

10  DFL JFM P as an attachment to counsel's declaration filed January 14, 2004 (docket no. 15); and

11        For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that

12  petitioner's application for a writ of habeas corpus be denied.

13        These findings and recommendations are submitted to the United States District

14  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

15  days after being served with these findings and recommendations, any party may file written

16  objections with the court and serve a copy on all parties.  Such a document should be captioned

17  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

18  shall be served and filed within ten days after service of the objections.  The parties are advised

19  that failure to file objections within the specified time may waive the right to appeal the District

20  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

21  DATED: January 3, 2006.

22

23

UNITED STATES MAGISTRATE JUDGE

24

25  001:villa1301.157

26